[Cite as *State v. Truitt*, 2011-Ohio-6599.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

KENNETH R. TRUITT, JR.

    Appellant

C.A. No.    25527

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 09 07 2078

DECISION AND JOURNAL ENTRY

Dated: December 21, 2011

MOORE, Judge.

{¶1} Appellant, Kenneth R. Truitt, Jr., appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms in part, reverses in part, and remands the matter for further proceedings.

I.

{¶2} On August 14, 2008, an altercation occurred between appellant Kenneth R. Truitt, Jr., and his girlfriend Gwendolyn Hooks. As a result of the incident, on July 17, 2009, Truitt was indicted on one count of rape, a felony of the first degree, one count of aggravated burglary, a felony of the first degree, one count of attempted rape, a felony of the second degree, one count of abduction, a felony of the third degree, and one count of assault, a misdemeanor of the first degree.

{¶3} Truitt entered a plea of not guilty and the matter proceeded to a jury trial on June 29, 2010. Prior to the beginning of the trial, the State dismissed the count of rape. The

remaining charges were tried before a jury. On July 1, 2010, the jury returned verdicts of guilty on the charges of aggravated burglary, abduction and assault. The jury was unable to reach a verdict on the remaining charge of attempted rape, which was subsequently dismissed.

{¶4} On July 12, 2010, the trial court sentenced Truitt to eight years of incarceration on the aggravated burglary charge, five years of incarceration on the abduction charge, and six months in the Summit County Jail on the assault charge, to be served concurrently for a total of eight years.

{¶5} Truitt timely filed a notice of appeal. He raises five assignments of error for our review. We have rearranged Truitt's assignments of error to facilitate our review.

II.

**ASSIGNMENT OF ERROR IV**

"[]TRUITT'S CONVICTIONS FOR AGGRAVATED ROBBERY AND A[B]DUCTION WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶6} In his fourth assignment of error, Truitt argues that his convictions for aggravated robbery and abduction were against the manifest weight of the evidence. We do not agree.

{¶7} When a defendant asserts that his conviction is against the manifest weight of the evidence,

> "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340.

{¶8} In making this determination, this Court is mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue* (1994), 97 Ohio

App.3d 459, 466, citing *Ostendorf-Morris Co. v. Slyman* (1982), 6 Ohio App.3d 46, 47 and *Crull v. Maple Park Body Shop* (1987), 36 Ohio App.3d 153, 154.

{¶9} Cassandra Blackmon testified that on August 14, 2008, she heard her neighbor, Gwendolyn Hooks, screaming through the walls of their duplex for Blackmon to call 911. Throughout the day, Blackmon had heard arguing coming from Ms. Hooks' apartment. She knew that Truitt was at Ms. Hooks' apartment. She heard Ms. Hooks screaming that she was being kicked and punched in the face, and to call for police. Specifically, Blackmon heard Ms. Hooks say, "Why are you kicking me? You [are] just going to punch me in my face like that?" Blackmon called 911 and said that her neighbor "was getting beat up" and could not leave. Blackmon was scared and called 911 three times because the screaming kept getting louder. It took the police over an hour to respond. Once the police arrived, Blackmon went over to Ms. Hooks' home to check on her. Blackmon testified that Truitt had left the duplex before police arrived. Blackmon also testified that Ms. Hooks was "frantic" and "partially naked." The apartment was a mess, and Ms. Hooks was bleeding and crying. After police were finished questioning Ms. Hooks, Blackmon took her to the emergency room.

{¶10} Ms. Hooks testified that she met Truitt in May 2008. The relationship began as a friendship and then escalated into a relationship. She described Truitt as "[v]ery insecure, controlling, and very, very jealous[.]" Although Truitt did not live with her, because he was her boyfriend, he did spend the night at times and kept some clothes at her house. At the time, she believed he was living at 912 Bye Street with a friend. Truitt did not have a key to her home.

{¶11} On August 14, 2008, Ms. Hooks was at home with her nephew, who at the time was eight or nine years old. Truitt came over, and Ms. Hooks cooked dinner for the three of them. After dinner, while her nephew was in the front room watching television, Truitt and Ms.

Hooks began drinking and smoking marijuana in the dining room. At some point, Truitt accused Ms. Hooks of having another man at her house. This escalated into an argument, and then Truitt hit her in the face. Ms. Hooks did not want her nephew to witness the argument, so she called her sister-in-law to pick him up. A male arrived and took the nephew home.

{¶12} Ms. Hooks testified that she repeatedly asked Truitt to leave the house, and that he refused. At one point, she went next door and called the police. She waited outside, but the police did not arrive. She went back into the home and again asked Truitt to leave. Truitt began yelling, cursing, and calling Ms. Hooks names. He told her if she "want[ed] to fool around with somebody" that he was "going to show [her.]" He proceeded to tear her clothes off of her, and she began screaming to her neighbor to call 911. Truitt began hitting her, punching her in her face and head, banging her head against the floor, and ripping her clothes off. She testified that he kept trying to put his fingers in her "private area." She tried to run out the back door, but he caught her and would not allow her to leave. He tried to apologize to her, and when she would not look at him, he punched her in the face, and she fell to the floor. He continued "stomping" and "punching" her. She managed to break free, and ran upstairs to the bathroom to call 911. Eventually, Ms. Hooks heard the police at her door. However, Truitt had left the house before they arrived. Ms. Hooks testified that, after the altercation, she had a bad bite mark on her ear and three bite marks on her hip. Hooks identified several photographs of her injuries. The day after the incident, Truitt called Ms. Hooks and left messages saying that he was sorry and that he loved her. Truitt wanted to come speak with Ms. Hooks, but she ignored the messages.

{¶13} Officer Karlton Starks, a police officer with the city of Akron, responded to a 911 call regarding an assault at Ms. Hooks' apartment on August 14, 2008. He testified that, when he arrived, he noticed that Ms. Hooks' clothes were disheveled and she was very frantic and

crying. He described the scene as "chaotic" and "in disarray." Ms. Hooks had an injury on her thigh several inches long that appeared to be a bite. After speaking with Ms. Hooks, Officer Starks turned the case over to the detectives and the Crime Scene Unit.

{¶14} Sergeant Michael Rinn, the midnight supervisor of the Crime Scene Unit, testified that he responded to Ms. Hooks' apartment on August 14, 2008. He was told that the victim had been sexually assaulted. He took photographs of the scene and collected what appeared to be hair. He testified that some of the hair was collected near blood on the living room floor. He also took photographs of the victim. One photograph shows an injury to the back of her right ear, and another shows a bite mark on her right thigh.

{¶15} Lynn Rogers, a triage nurse in the St. Thomas Emergency Department, testified that she saw Ms. Hooks in the emergency room in the early hours of August 15, 2008. She testified that Ms. Hooks reported that she had been assaulted by her significant other. Specifically, she was "hit repeatedly in head, kicked in the back, ha[d] positive bite mark to right leg" and the significant other "did attempt to choke her[.]" Ms. Hooks "had a major injury to the left side of her upper lip." When asked what level of pain she was experiencing on a scale of zero to ten, Ms. Hooks responded that she was at a seven. She specifically said that she felt pain in her mouth and her head. Rogers' reports indicate that "[b]ite wounds" were cleansed on the ear, thigh, and buttocks area. Because this was reported as a sexual assault, Rogers contacted the Domestic Violence Enforcement Unit ("DOVE") unit.

{¶16} Valorie Prulhiere, a sexual assault nurse with the DOVE unit, testified that she examined Ms. Hooks and took a statement from her on August 15, 2008. Ms. Hooks named Truitt as the assailant. Prulhiere also collected swabs from Hooks' thigh and flank. Those swabs were given to police.

{¶17} Detective John Ross testified that he collected DNA samples from Ms. Hooks and Truitt and submitted them for analysis. BCI forensic scientist Lindsey Nelsen-Rasch testified that she received the samples. The samples were sent to LabCorp for analysis.

{¶18} LabCorp forensic scientist Shaw Weiss testified that LabCorp examined swabs from Ms. Hooks' wounds for DNA. There was a partial profile from the flank wound that was consistent with Truitt. The thigh wound showed a mixture consistent with Ms. Hooks and Truitt. LabCorp also did Y-STR testing, a better exclusion than inclusion test since all males in the paternal lineage will have the same Y-STR profile. Using Y-STR, Truitt and his paternal relatives could not be excluded as a source of the DNA on the thigh wound.

{¶19} Wanda Newsome testified that she and Truitt had previously been in an on and off again relationship. They were a couple in December of 1995. On December 3, 1995, Truitt "jumped" her. He bit her on the ear, arm, and forehead. This testimony was allowed after a cautionary instruction by the court limiting the purposes for which the jury could consider the testimony.

{¶20} Truitt did not present any testimony or offer any exhibits in his defense. During closing arguments, he admitted that he assaulted Ms. Hooks.

{¶21} On appeal, Truitt argues that his convictions for aggravated robbery and abduction are against the manifest weight of the evidence because "[t]he evidence for these charges depends entirely upon the testimony of Ms. Hooks," and portions of her testimony are contradictory. Specifically, he argues that she gave "several conflicting versions of the sequence of the[] events[.]" In addition, he argues that the "jury lost its way when it improperly applied Ms. Hooks' statements that [] Truitt did not live at the residence. Despite Ms. Hooks' contentions otherwise, there was ample evidence" that Truitt lived with her.

{¶22} We have repeatedly stated that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. No. 25161, 2010-Ohio-3296, at ¶15. The trier of fact, here the jury, "has the right to place considerable weight on the testimony of the victim." *State v. Felder* (July 29, 1992), 9th Dist. No. 91CA005230, at *1. The jury here chose to believe the victim's testimony notwithstanding minor inconsistencies in her testimony. We cannot say that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Otten*, 33 Ohio App.3d at 340. Truitt's fourth second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

"THE TRIAL COURT ERRED BY ADMITTING HEARSAY EVIDENCE AT TRIAL[.]"

{¶23} In his first assignment of error, Truitt argues that the trial court erred by admitting hearsay evidence at trial. We do not agree.

{¶24} Generally, this Court reviews a trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Roberts*, 156 Ohio App.3d 352, 2004-Ohio-962, at ¶14. However, the Ohio Supreme Court has held that "[w]hen a court's judgment is based on an [arguably] erroneous interpretation of the law, an abuse-of-discretion standard is not appropriate." *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, at ¶13. "Whether evidence is admissible because it falls within an exception to the hearsay rule is a question of law, thus, our review is de novo." *Monroe v. Steen*, 9th Dist. No. 24342, 2009-Ohio-5163, at ¶11, citing *State v. Denny*, 9th Dist. No. 08CA0051, 2009-Ohio-3925, at ¶4.

{¶25} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence. "Should hearsay statements be admitted improperly, however, such error does not necessarily require reversal of the outcome of the trial if it was harmless. See *Arizona v. Fulminante* (1991), 499 U.S. 279, 306-09. Crim.R. 52(A) describes a harmless error as one 'which does not affect substantial rights [and therefore] shall be disregarded.' In order to find harmless error in a criminal matter, a reviewing court must find that the error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18. 'When determining whether the admission of evidence is harmless * * * this Court must find "there is no reasonable probability that the evidence may have contributed to the defendant's conviction."'" (Citation omitted.) *State v. Jones*, 9th Dist. No. 24469, 2010-Ohio-879, at ¶46.

{¶26} At trial, Valorie Prulhiere, a sexual assault nurse with the DOVE unit, testified to several statements the victim made to her at the hospital. Truitt registered a continuing objection to Prulhiere's testimony. The basis of the objection was that such statements did not constitute statements made for purposes of medical diagnosis or treatment. The trial court overruled the objection.

{¶27} Evid.R. 803(4) provides a hearsay exception for "[s]tatements for purposes of medical diagnosis or treatment." Truitt fails to direct this Court to the particular statements he believes the trial court erred in admitting. He appears to take issue with Prulhiere's testimony surrounding the identification of the attacker and the responses Prulhiere received when she asked Ms. Hooks "about the alleged assault and rape, [and] asked her to reenact a portion of the alleged attack[.]" We conclude that any error in admitting the evidence was harmless.

{¶28} The evidence surrounding Ms. Hooks' assault, recounted in the above assignment of error, was overwhelming. Ms. Hooks testified to the events in question, including the identity

of her attacker. Her neighbor, Blackmon, testified that she heard the attack and was aware that Truitt was at the home. The officers described the scene as in "disarray" and described Ms. Hooks' injuries. The triage nurse testified to Ms. Hooks' injuries, and said that Ms. Hooks identified Truitt as her attacker. Accordingly any error in admitting Prulhiere's statement regarding the identity of the attacker and the circumstances surrounding the attack was harmless beyond a reasonable doubt. *State v. Tate*, 9th Dist. No. 21943, 2005-Ohio-2156, at ¶22, citing *State v. Williams* (1983), 6 Ohio St.3d 281, 290. Truitt's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

"THE TRIAL COURT ERRED BY ADMITTING DNA EVIDENCE AT TRIAL[.]"

{¶29} In his second assignment of error, Truitt argues that the trial court erred by admitting DNA evidence at trial. Specifically, he argues that "[i]n addition to the low probabilities yielded from the samples undergoing the Y-STNR [sic] testing, the entire chain of custody was not proven for any of all samples of DNA evidence collected." We do not agree.

{¶30} As stated above, we review a trial court's admission of evidence for abuse of discretion. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶79. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶31} At trial, Truitt objected to the admission of the DNA evidence arguing that the State failed to establish the chain of custody. The State argued that the chain of custody is a matter that goes to the weight of the evidence, and not admissibility. Truitt also appeared to question the expert's qualifications to testify because there was never "testimony or opinions that [the DNA evidence] was based on a reasonable degree of scientific certainty." Finally, Truitt argued that there was no "reasonable scientific certainty to a one in 44 probability" with regard

to the Y-STR testing. The trial court overruled his objections and concluded that the LabCorp report and testimony by the officers and LabCorp technician were sufficient to establish a chain of custody to present it to the jury. Further, the trial court concluded that Weiss was qualified to testify "considering his background, training, experiences as an expert witness and other factors that he was qualified as an expert in DNA." In addition, Weiss gave "his opinions with a degree of scientific certainty even though he may not have said the magic words."

{¶32} On appeal, Truitt reiterates the above arguments and further argues that the evidence should have been excluded pursuant to Evid.R. 403(A) because the Y-STR testing has a "low probative value" and "[t]he reliability of the Y-STNR [sic] testing was further diminished by the gap in the chain of custody, as was the reliability of the remainder of other DNA testing. The DNA evidence created a danger of confusion which substantially outweighed the probative value of such evidence."

{¶33} "Y-STR is a type of DNA testing that concentrates solely on the male DNA. It is an exclusion DNA type of testing; using Y-STR testing alone one can never uniquely identify a particular male because the exact same Y chromosome profile is passed down from father to son. Thus, the results of Y-STR testing either exclude the individual and any of his patrilineal relatives or cannot exclude the individual and any of his patrilineal relatives." *State v. Lanier*, 7th Dist. No. 09 MA 97, 2010-Ohio-6382, at ¶48. This type of testing is typically done where DNA evidence includes a mixture of male and female DNA. The test ignores the female DNA, concentrating only on the male DNA profile. *State v. Warren*, 11th Dist. No. 2010-T-0027, 2011-Ohio-4886, at ¶17.

{¶34} Detective John Ross testified that he collected DNA samples from Ms. Hooks and Truitt and submitted them for analysis. BCI forensic scientist Lindsey Nelsen-Rasch testified that she received the samples. The samples were sent to LabCorp for analysis.

{¶35} LabCorp forensic scientist Shaw Weiss testified that LabCorp examined swabs from Ms. Hooks' wounds for DNA. They were able to obtain a complete DNA profile from the right ear wound. The DNA was consistent with Ms. Hooks. There was a partial DNA profile from the flank wound that was consistent with DNA obtained from Truitt. The frequency of occurrence of this particular gene sequence in an African-American was one in greater than the world population of 6.8 billion. The thigh wound showed a mixture consistent with DNA from Ms. Hooks and from Truitt. The odds of the contributors being both Ms. Hooks and Truitt were 25.2 billion times more likely to occur compared to a mixture of Ms. Hooks and an unknown African-American individual.

{¶36} LabCorp also conducted Y-STR testing. Using Y-STR, Truitt and his paternal relatives could not be excluded as a source of the DNA on the thigh wound. The database was 10,449 individuals. No matches were found for the thigh DNA, which equated to one individual in 3,497 males having that profile. For the flank wound, the database was 14,875 individuals and the final result was that one in every 44 male individuals would match the DNA profile.

{¶37} We conclude that Truitt has failed to show that the trial court abused its discretion in allowing admission of the DNA evidence. The testimony discusses the chain of custody, and Weiss testified as to his qualifications to support his testimony as an expert witness. Although the Y-STR results did not identify Truitt with "high probability," it was not intended to do so. "Y-STR testing cannot uniquely identify a particular male; rather, it is a test used to exclude individuals." *Lanier* at ¶72. The results, including the frequency of occurrence, were presented

to the jury to demonstrate that Truitt's male family lineage could not be excluded as the source of the DNA. "The jury was in the best position to determine the weight that the results carried and that decision will not be second guessed." *Lanier* at ¶72, citing *State v. Barnhardt*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, at ¶41. The trial court did not err in admitting evidence from DNA testing. Accordingly, Truitt's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"THE TRIAL COURT ERRED BY ADMITTING PRIOR BAD ACT EVIDENCE AT TRIAL[.]"

{¶38} In his third assignment of error, Truitt argues that the trial court erred by admitting evidence of prior bad acts. We do not agree.

{¶39} We review the trial court's decision to admit the evidence introduced by Newsome under an abuse of discretion standard. See *State v. Clay*, 9th Dist. No. 04CA0033-M, 2005-Ohio-6, at ¶34. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

{¶40} The trial court permitted Newsome to testify that on December 3, 1995, she was "jumped" by Truitt. The two had been in an "on and off" relationship since they were twelve years old. She testified that on that date, Truitt came home after drinking and became violent and began biting her. He bit her on the ear, arm, and forehead. She ran to a neighbor's house and called 911. She was taken to the emergency room. She was told that "the way [her ear] was torn," they were unable to "sew [it] back on" so they "bandaged [it] up." Newsome identified Truitt as the man who bit her in 1995.

{¶41} Evidence of prior criminal acts, which are wholly independent of the crime for which a defendant is on trial, is generally inadmissible. *State v. Watkins*, 9th Dist. No. 02CA008087, 2003-Ohio-1308, at ¶7, citing *State v. Thompson* (1981), 66 Ohio St.2d 496, 497.

However, an exception to this general rule exists as provided for in R.C. 2945.59 and Evid.R. 404(B). Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts * * * may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." R.C. 2945.59 provides: "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

**{¶42}** In *State v. Roper*, 9th Dist. No. 22566, 2005-Ohio-6327, we noted that "the standard for determining the admissibility of such evidence is strict, and the statute section and rule must be construed against admissibility. However, this strict admissibility standard must be considered contemporaneously with the fact that the trial court occupies a superior vantage in determining the admissibility evidence." (Internal citations and quotations omitted.) Id. at ¶9.

**{¶43}** In this case, evidence that Newsome was attacked by Truitt was relevant to show a similar "scheme, plan, or system." R.C. 2945.59. See, also, *State v. Stephens*, 9th Dist. No. 23845, 2008-Ohio-890, at ¶16, citing *State v. Blonski* (1997), 125 Ohio App.3d 103, 113, and *State v. Elliott* (1993), 91 Ohio App.3d 763, 771. The court found similarities between Newsome's and the victim's accounts of the attacks, including the fact that each had bite marks on their bodies.

**{¶44}** This Court has also held that "[w]hen using a defendant's prior acts to show his intent, the offense for which the defendant is being tried and the other act must have occurred

reasonably near to each other and a similar scheme, plan or system must have been utilized to commit the offense at issue and the other offenses." (Citations and internal quotations omitted.) *State v. Morrow*, 9th Dist. No. 23960, 2008-Ohio-3958, at ¶16. We conclude that the incident with Newsome in 1995 and the incident at issue here occurred "reasonably near to each other." *Blonski*, 125 Ohio App.3d at 113. See, also, *State v. Vinson*, 9th Dist. No. 23949, 2008-Ohio-2523, at ¶11 (finding no error in allowing evidence of multiple prior acts that had occurred several years prior to show intent and absence of mistake); *Roper* at ¶11-12 (finding no error in the admission of other acts evidence that occurred over a span of 27 years prior to the incident at trial because "intent, purpose and knowledge are elements of several of the crimes charged," thereby making the other act evidence "particularly relevant."). In addition, the record demonstrates that a similar "scheme, plan, or system" was utilized in each occurrence. Both victims had visible bite marks from Truitt on their bodies, particularly their ears.

{¶45} Moreover, the trial court gave a cautionary instruction before Newsome testified. It also gave an instruction at the conclusion of the evidence that the testimony only went to possibly proving motive, intent, knowledge, or lack of mistake. There is a presumption that the jury follows the instructions of the court. *State v. Moultry*, 9th Dist. No. 25065, 2010-Ohio-3010, at ¶17. See, also, *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, at ¶51 (concluding that the trial court did not abuse its discretion in admitting "other acts" evidence where it provided an appropriate cautionary instruction). We conclude that Truitt has failed to show an abuse of discretion by the trial court in admitting Newsome's testimony. Accordingly, Truitt's third assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

"[]TRUITT WAS UNLAWFULLY SENTENCED UPON ALLIED OFFENSES OF SIMILAR IMPORT[.]"

In his fifth assignment of error, Truitt argues that he was unlawfully sentenced upon allied offenses of similar import. Specifically, he argues that the convictions for assault, abduction, and aggravated burglary are allied offenses of similar import.

{¶46} Truitt acknowledges that he did not object at sentencing, and thus, he may only argue plain error on appeal. The Supreme Court of Ohio has held that the failure to properly merge convictions on allied offenses of similar import constitutes plain error because even when sentences are run concurrently, "a defendant is prejudiced by having more convictions than are authorized by law." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, at ¶31. The Ohio Supreme Court recently decided *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, which concluded that, in determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. Examining the defendant's conduct allows a court to determine whether it is possible to commit both offenses by the same conduct. Id. at ¶48. If both offenses can be committed by the same conduct, then a court must determine "whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" Id. at ¶49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, at ¶50 (Lanzinger, J., concurring in judgment only). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Johnson* at ¶50.

{¶47} Because *Johnson* was decided after the trial court sentenced Truitt, the trial court did not have the opportunity to consider *Johnson* in deciding whether the offenses at issue were allied and, if so, the State has not had the opportunity to elect on which offense it wishes to

proceed for sentencing. This Court expresses no position on that issue at this time. Rather than decide this issue in the first instance, we must remand this matter to the trial court for a determination as to whether Truitt's offenses are, in fact, allied offenses of similar import. *Johnson* at ¶49-50, citing *Brown* at ¶50. See, also, *State v. McDaniel*, 9th Dist. No. 25492, 2011-Ohio-5001; *State v. Vitt*, 9th Dist. No. 10CA0016-M, 2011-Ohio-1448; *State v. Jones*, 9th Dist. No. 25676, 2011-Ohio-4934. Therefore, we reverse on this basis and remand to the trial court for the application of *Johnson* in the first instance.

## III.

{¶48} Truitt's fifth assignment of error is sustained to the extent that the judgment must be reversed for the application of *Johnson*, supra. The remaining assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the matter is remanded to the trial court for consideration of the issue raised in Truitt's fifth assignment of error.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____

CARLA MOORE
FOR THE COURT

CARR, P. J.
CONCURS

DICKINSON, J.
CONCURS, SAYING:

{¶49}  I concur in the majority's judgment and in most of its opinion.  I do not concur in the majority's statement at paragraph 39 that an abuse of discretion standard applies to the admission of other act evidence.  This Court held otherwise in *State v. Morris*, 9th Dist. No. 09CA0022-M, 2010-Ohio-5682, at ¶2, 3, which holding is currently under review by the Ohio Supreme Court.

APPEARANCES:

TODD M. CONNELL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.